[Cite as *State v. Rittinger*, 2022-Ohio-4339.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES: |
| | Hon. William B. Hoffman, P. J. |
| Plaintiff-Appellee | Hon. John W. Wise, J. |
| | Hon. Craig R. Baldwin, J. |
| -vs- | |
| | Case No. 2022 CA 00009 |
| CLINT RITTINGER | |
| | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:      Criminal Appeal from the Court of Common
Pleas, Case No. 2021 CR 00143


JUDGMENT:                   Affirmed


DATE OF JUDGMENT ENTRY:      December 5, 2022


APPEARANCES:

For Plaintiff-Appellee              For Defendant-Appellant

WILLIAM C. HAYES              TODD W. BARSTOW
PROSECUTING ATTORNEY      261 West Johnstown Road
ROBERT N. ABDALLA          Suite 204
ASSISTANT PROSECUTOR      Columbus, Ohio 43230
20 South Second Street
Newark, Ohio 43055

*Wise, J.*

**{¶1}** Defendant-Appellant Clint Rittinger appeals his convictions and sentences on one count of felonious assault and one count of domestic violence following a jury trial in the Licking County Court of Common Pleas.

### STATEMENT OF THE FACTS AND CASE

**{¶2}** On March 11, 2021, the Licking County Grand Jury returned an indictment charging Appellant Clint Rittinger with one count of Felonious Assault, in violation of R.C. §2903.11(A)(1), a felony of the second degree; and one count of Domestic Violation, in violation of R.C. §2919.25(A), a misdemeanor of the first degree.

**{¶3}** A jury trial began on December 15, 2021. The following facts were adduced at trial.

**{¶4}** The victim in this case, A.G., testified that she and her boyfriend, Appellant Clint Rittinger, lived together at 79 Columbia Street in Newark, Ohio. (T. at 97). She stated that she was with Appellant the day and evening of February 26, 2021, and early morning of February 27. (T. at 99). On that day, the two of them went to a bar, Thirty-One West, to have alcoholic drinks. (T. at 99-100). After having a few drinks at Thirty-One West, A.G. and Appellant went to another bar, Tony's, to have a few more drinks. (T. at 100-101). A.G. could not recall the time she and Appellant arrived at Tony's but testified that it was "very late in the evening." (T. at 101).

**{¶5}** While at Tony's, A.G. and Appellant got into a verbal argument. (T. at 101). Appellant yelled at A.G. and stated that their relationship was over and that he was going to go home and pack up his stuff and move out. *Id.* A.G. attempted to calm Appellant down, and they both left the bar and went home together. *Id.*

{¶6}    Upon arriving at their residence, the couple's argument resumed. *Id.* The couple continued yelling at each other while Appellant began emptying his clothes from his dresser and closet. *Id.* Appellant told A.G. that he was tired of her being an "attention whore," and A.G. repeatedly begged Appellant, "Please don't leave me. Please don't leave." (T. at 103).

{¶7}    At some point, A.G. told Appellant that if he wanted to leave, she would help him. *Id.* She then began to grab Appellant's clothes and throw them outside through the upstairs bedroom window. *Id.* A.G. testified that at that point, Appellant grabbed her by her arms and slammed her up against the wall and punched two holes in the wall right next to her face. (T. at 104). A.G. then pushed Appellant in the chest, and Appellant stumbled into a dresser behind him. *Id.* A.G. testified that Appellant braced himself on the dresser, and then lunged at her. *Id.* Appellant then found herself on the ground, with Appellant directly over her with him grabbing her shirt and "then everything goes dark." (T. at 104, 109). In response to questioning regarding whether she remembered Appellant hitting her she stated: "I do not remember the actual impacts. It is very - I remember him coming at me and then it's black until it's kind of hazy and I see him over top of me holding me and then it goes black again, and then I'm on my hands and knees - with- looking at the blood." (T. at 126).

{¶8}    A.G.'s next memory is her on her hands and knees with blood all over the carpeted floor. *Id.* A.G. was unable to open her right eye and was unable to stand up. (T. at 104-105). Appellant was on his knees next to A.G., and A.G. repeatedly told Appellant that she needed help and that "we need to call the police, something's wrong." Appellant pulled A.G. up by the elbow, stood her in the hallway and told her, "If you call the cops,

I'm never going to see my kids again." (T. at 105). Appellee then stumbled down the stairs to use her phone where she called 9-1-1. (T. at 106).

{¶9} Police and medical personnel arrived and provided medical attention to A.G. in her kitchen and then transported her to Licking Memorial Hospital ("LMH"). (T. at 111). After receiving treatment and undergoing various diagnostic scans, an LMH doctor told A.G. that they were very concerned about the extent of her injuries and concerned about saving her eye and her eyesight. (T. at 112). Consequently, A.G. was transported to OSU Medical Center so she could receive specialized medical care. *Id*. Ultimately, A.G. underwent two surgeries to rebuild her nose and nasal cavity, skin grafting that left her with a permeant scar on her rib cage, and she will require another procedure. (T. at 113).

{¶10} The State submitted A.G.'s medical records from LMH as evidence without objection. (T. at 120).

{¶11} A.G. was shown photographs of her bedroom, and she identified where Appellant punched holes in the walls, where Appellant attacked her, where she found herself on the ground, and identified where her blood had stained the carpet. (T. at 107-108). In one of the photographs, Appellant also identified a shirt that was on the ground, which Appellant had been wearing that evening when he attacked her. (T. at 110). A.G. identified herself in photographs taken in her kitchen by emergency personnel prior to her being transported to LMH. (T. at 114).

{¶12} Officer Robert Brown, a patrol officer with the Newark Police Department, responded to the February 27, 2021, incident at 79 Columbia Street along with Officer Adam Carter. (T. at 128-129). Officer Brown testified that upon arriving at the residence, he found A.G. in the kitchen on her hands and knees in the dark; she was hysterical

"almost grasping for air because she was crying so hard"--covered in blood, with blood on her shirt and on the ground. (T. at 131). Officer Brown stated that A.G. told him Appellant shoved her into the wall, and she later remembered crawling down the stairs. (T. at 139). Officer Brown took photographs of A.G. at the house and later at LMH, which were admitted into evidence. (T. at 137-139, 241-242). Officer Brown also took additional photographs of inside the residence, including pictures of the living room and bedroom, which were also admitted. (T. at 139-142, 241-242).

{¶13} Officer Adam Carter, another patrol officer with the Newark Police Department, also testified regarding the February 27, 2021, incident. (T. at 156). Upon arriving at 79 Columbia Street, Officer Carter found Appellant standing outside by the concrete patio with both hands raised in the air in a "don't shoot" pose. (T. at 157-158). Officer Carter observed that Appellant was very intoxicated: Appellant's eyes were bloodshot and glossy, he had a strong odor of alcohol, his speech was slurred, and he had a hard time standing up on his own. (T. at 158, 160). Officer Carter noted that Appellant had a couple of scratches on his face, and his fingers were bloody. (T. at 158-159). Officer Carter asked Appellant if he had any idea what had happened and if he knew how A.G. received her injuries. (T. at 169.). Appellant told Officer Carter that he and A.G. had been out drinking at Tony's, got into a fight and left, and that after arriving home they continued to fight. *Id.* Appellant told Officer Carter that he and A.G. began to shove each other, she scratched his face, and he punched the wall. (T. at 162). Appellant claimed he did not have any idea how A.G. received her injuries. (T. at 160, 162). Officer Carter also collected the blood-covered clothing both Appellant and A.G. were wearing that night, which the State submitted as evidence. (T. at 163, 244).

{¶14} Jesse Meyers, a firefighter and paramedic with the Newark Fire Department, testified that he responded to the call to 79 Columbia Street and that upon arriving at the residence, he observed A.G. crying on the kitchen floor with injuries to her face. (T. at 149). Meyers created a patient care report based on his initial emergency care provided to A.G. and transported A.G. to the hospital in an ambulance. *Id*. The patient care report was admitted as evidence. (T. at 242).

{¶15} Dr. Joseph Fondriest, a radiologist working at LMH the early morning of February 27, 2021, testified regarding A.G.'s injuries. (T. at 170). Dr. Fondriest reviewed CT studies of A.G.'s face and head and found left and right fractures to A.G.'s nasal bone, as well as a "blowout" fracture to the right orbital bone with displacement toward the nasal cavity. (T. at 171-173). Dr. Fondriest testified that a blowout fracture is a skull fracture which requires a significant amount of force, and which is often caused by a direct blow by something such as a softball. (T. at 173-176).

{¶16} Detective Tim Elliget, a criminalist with the Newark Police Department who is also assigned to the Central Ohio Regional Crime Lab, testified as an expert on blood spatter for the State. (T. at 187-188). Det. Elliget reviewed photographs of the crime scene and analyzed two impact areas on the wall with significant blood splatters. He stated that it was his opinion that the blood spatters were not caused by direct contact with a bleeding object, but by an object making impact with the wall and multiple splatters flying off of the impacting object and onto the wall. (T. at 187-199). Det. Elliget opined that the splatters were not caused by a single impact, but indicated they were caused by multiple blows to the bleeding object. (T. at 200-201). Det. Elliget also noted an impact area with significant blood spatter had human hair mixed with the blood. (T. at 203).

**{¶17}** Following Det. Elliget's testimony, the State rested. Appellant made a motion pursuant to Criminal Rule 29 for directed verdict, which the trial court denied. (T. at 245-252).

**{¶18}** Appellant took the stand in his own defense. He testified that he consumed eight alcoholic drinks the night of the incident and believed that A.G. had consumed approximately the same amount. (T. at 256). Appellant confirmed that he and A.G. had a verbal argument at Tony's bar because "she kind of got handsy with somebody." (T. at 257). Appellant testified that they left Tony's at approximately 11:30 p.m. and returned to the residence, where they argued for several hours, emphasizing that the physical altercation did not happen right away. *Id.* He stated that he went upstairs to the bedroom to retrieve his clothes, but A.G. blocked his path by standing in the doorway. (T. at 260). He testified that A.G. began to argue with him, and that the argument continued for approximately forty-five minutes. *Id.* He stated that A.G. became increasingly belligerent and "starts swinging at me wildly." (T. at 261). He recalled that A.G. then told him, "If you want to leave, I'll help you leave," and she started grabbing his clothes and throwing them out of the upstairs bedroom window. *Id.* Appellant testified that he then got angry and punched the wall for the first time. (T. at 263). A.G. then jumped on Appellant's back, clawed him across his chest and face, which then caused Appellant to fall backwards and onto A.G. (T. at 265). Appellant then got up and punched the wall the second time. (T. at 267). Appellant testified that punching the wall twice caused a bleeding injury to his hand. (T. at 264). After he punched the wall for the second time, Appellant turned and saw A.G. on the ground. (T. at 267-268). He asked her if she was okay and tried to help her up. *Id.* A.G. angrily refused Appellant's help, stood up, and started swinging at Appellant, forcing

him to grab her arms and hold them down so she could not hurt him. (T. at 268). Appellant stated that A.G. then lunged at him, attempting to bite his face. *Id.* Appellant lost his balance and fell backwards, and A.G. fell forward into the wall and hit her face on the wall. *Id.* Appellant then rolled A.G. over and stood over top of her, and A.G. started coughing up blood, which "raspberried up the side of the wall." *Id.* A.G. told Appellant that she needed to call an ambulance, and Appellant told her that her phone was downstairs. (T. at 269). Appellant testified that he did not strike or punch A.G., did not hit her in the head, or otherwise cause physical harm to her on purpose. (T. at 271).

{¶19} On cross-examination, Appellant confirmed that he lived with A.G., and they were in an intimate relationship. (T. at 273). Appellant agreed that on the night of February 26th and early morning of February 27th, he and A.G. had been drinking heavily. (T. at 274-276). Appellant agreed that he was intoxicated and angry with A.G. *Id.* However, upon further questioning, Appellant stated that was not angry and does not get angry because he is stoic. (T. at 276). Appellant confirmed that he did not tell the responding officers that A.G. had clawed his chest, that A.G. jumped on his back, or that A.G. had hurt herself and caused a bloody mess by diving headfirst into the wall. (T. at 281-282). Appellant further confirmed that when the responding officer asked him how A.G. received her injuries, he responded, "I don't know." (T. at 282).

{¶20} Following Appellant's testimony, the defense rested. The trial court adjourned for the day, and the State indicated that it did not yet know whether it would call any rebuttal witnesses, but would know by the next morning.

{¶21} When the jury trial resumed, counsel for both parties and the trial court conferred prior to bringing the jury in. The State announced its intention to introduce a

deleted photograph A.G. had recovered from her phone and provided to the prosecution the previous evening, which contained a time and date stamp placing Appellant and A.G. at Tony's bar at 1:17 a.m. (T. at 309). The State sought to introduce the photograph to rebut Appellant's testimony that they had left the bar at 11:30 p.m. and returned to the house where they argued for two-and-a-half hours. *Id.* Appellant's trial counsel objected to the photograph's introduction, and in the alternative moved for a continuance to permit Appellant time to examine A.G.'s phone. (T. at 309-318). The State assured the court they had not withheld the photograph and were not in possession of the photograph until the previous evening, and had sought it from the victim in response to Appellant's testimony that they left the bar at 11:00 p.m. *Id.*

{¶22} The trial court overruled the objection and denied Appellant's request for a continuance as a continuance would force a mistrial. *Id.* Appellant then moved for a mistrial, which the trial court also denied. *Id.*

{¶23} The State then called A.G. to testify on rebuttal. (T. at 320). A.G. identified a photograph of her and Appellant at Tony's she had taken on her phone on the night in question. (T. at 321-328). The photograph contained a 1:12 a.m. time stamp. (T. at 322).

{¶24} The State next called Det. Elliget as a rebuttal witness. (T. at 329). Det. Elliget testified that the blood splatters on the wall would not have been caused by expirateed [sic] blood or "raspberries." (T. at 330). Additionally, Det. Elliget disagreed that the blood splatter patterns indicate the blood stains could have been caused by someone falling headfirst into the wall, stating that the wall damage and blood splatter would have required multiple impacts to the wall and several blood-transfer events. (T. at 332-334).

**{¶25}** Following deliberations, the jury returned a verdict of guilty to all charges. (Judgment Entry, filed December 17, 2021).

**{¶26}** On January 31, 2022, the matter proceeded to sentencing wherein the trial court found that Counts 1 and 2 merged for sentencing purposes, and the State elected to proceed on Count 1. The trial court then sentenced Appellant to a prison term of four (4) to six (6) years, and upon release from prison, a mandatory minimum of eighteen (18) months and up to a maximum three (3) year term of post-release-control supervision.

**{¶27}** Appellant now appeals, raising the following assignments of error:

## ASSIGNMENTS OF ERROR

**{¶28}** "I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF FELONIOUS ASSAULT AND DOMESTIC VIOLENCE THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶29}** "II. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY PERMITTING THE STATE TO PRESENT REBUTTAL EVIDENCE.

**{¶30}** "III. THE TRIAL COURT ERRED BY DENYING APPELLANT'S MOTION FOR A MISTRIAL.

**{¶31}** "IV. THE TRIAL COURT SENTENCED APPELLANT TO INDEFINITE TERMS OF INCARCERATION PURSUANT TO A STATUTORY SCHEME THAT

VIOLATES APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS."

**I.**

**{¶32}** In his first assignment of error, Appellant argues the jury verdicts were against the manifest weight and sufficiency of the evidence. We disagree.

**{¶33}** A review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct determinations. *State v. Gulley* (Mar. 15, 2000), 9th Dist. No. 19600, at 3. "While the test for sufficiency requires a determination of whether the State has met its burden of production at trial, a manifest weight challenge questions whether the State has met its burden of persuasion." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 390, 678 N.E.2d 541.

**{¶34}** In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, superseded by State constitutional amendment on other grounds in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668.

**{¶35}** Specifically, an appellate court's function, when reviewing the sufficiency of the evidence to support a criminal conviction, is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks, supra.* This test raises a question of law and does not allow the court to weigh the evidence. *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could

have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541.

{¶36} "Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Roberts* (Sept. 17, 1997), 9th Dist. No. 96CA006462. Thus, a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency. *Cuyahoga Falls v. Scupholm* (Dec. 13, 2000), 9th Dist. Nos. 19734 and 19735, unreported.

{¶37} In determining whether a conviction is against the manifest weight of the evidence, an appellate court: "[M]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten* (1986), 33 Ohio App.3d 339, 340, 515 N.E.2d 1009.

{¶38} A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Id.* at 388, 678 N.E.2d 541. An appellate court must make every reasonable presumption in favor of the judgment and Findings of Fact of the trial court. *Karches v. Cincinnati* (1988), 38 Ohio St.3d 12, 19, 526 N.E.2d 1350. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not

reach the conclusion reached by the trier of fact." *State v. Clemons* (1998), 82 Ohio St.3d 438, 444, 696 N.E.2d 1009, *citing State v. Jenks, 61 Ohio St.3d at 273, 574 N.E.2d 492*. Therefore, this Court's "discretionary power * * * should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717; *See, also, Otten*, 33 Ohio App.3d at 340, 515 N.E.2d 1009.

**{¶39}** In this case, Appellant was convicted of Felonious Assault, in violation of R.C. §2903.11(A)(1), a felony of the second degree. R.C. §2903.11(A)(1) provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another[.]"

**{¶40}** Additionally, Appellant was convicted of Domestic Violence, in violation of R.C. §2919.25(A), a felony of the fifth degree. Pursuant to R.C. §2919.25(A), "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."

**{¶41}** During the trial, the State presented testimony from 6 witnesses, including the victim, A.G. A.G. testified that Appellant slammed her against her bedroom wall, punched holes in the wall right next to her head, and lunged at her before "everything went black." She stated that she had moments of intermittent consciousness where she recalled Appellant being on top of her on the floor. She testified that she was severely injured, covered in blood, that Appellant did not call for medical help, and told her that if she called the cops "I will never see my kids again."

**{¶42}** Officer Carter testified Appellant was intoxicated and claimed he had no idea how A.G. received her injuries. Appellant's fingers were bloody and the clothes that he was wearing were covered in blood.

{¶43} Det. Elliget testified that the blood splatters on the walls were caused by some object impacting the wall, with multiple blood transfer events, likely caused by repeated medium velocity blunt strikes. Dr. Elliget testified he did not believe the blood spatters on the walls could have been caused by something falling into the wall or being blown onto the wall.

{¶44} Dr. Fondriest testified that A.G. suffered multiple nasal bone fractures and an orbital skull fracture. Dr. Fondriest testified that the skull fracture would have required significant force and is likely caused by something "like a softball" impacting the face and displacing the orbital bone into the nasal cavity.

{¶45} The jury also heard Appellant's testimony that he did not strike A.G. or throw her into the wall, but that A.G. injured herself by falling onto the ground and then falling into the wall. Appellant also testified that A.G. attacked him, and that any physical response from him was in self-defense or because he was provoked.

{¶46} The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Frye*, 5th Dist. Richland No. 17CA5, 2017-Ohio-7733, 2017 WL 4176953, ¶ 47 quoting *State v. Johnson*, 5th Dist. Stark No. 2014CA00189, 2015–Ohio–3113, 41 N.E.3d 104, ¶ 61, citing *State v. Nivens*,

10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). The jury need not believe all of a witness' testimony, but may accept only portions of it as true. *Id.*

**{¶47}** Based on the foregoing, we find that viewing the evidence in the light most favorable to the prosecution, the jury could find that Appellant assaulted and caused serious physical harm to A.G.  The jury was in the best position to determine the credibility of the witnesses and could choose to believe A.G.'s account over Appellant's version of events. The jury thus had sufficient evidence to find Appellant guilty of felonious assault

**{¶48}** The jury also had sufficient evidence to find Appellant and A.G. were living together in an intimate relationship when he caused the physical harm to A.G. The jury therefore also had sufficient evidence to find Appellant guilty of domestic violence

**{¶49}** After a careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the trial court clearly lost its way when it found Appellant guilty of Felonious Assault and Domestic Violence. Based on the foregoing, this Court does not find that Appellant's convictions were against the manifest weight of the evidence

**{¶50}** Appellant's first assignment of error is overruled.

**II.**

**{¶51}** In his second assignment of error, Appellant argues the trial court erred in permitting the state of Ohio to present rebuttal evidence. We disagree.

**{¶52}** More specifically, Appellant argues that the trial court erred in allowing the State to introduce a photograph from A.G.'s phone which showed her and Appellant at Tony's bar with a date and time stamp of 1:12 a.m. on February 27, 2021, and A.G.'s testimony authenticating same, after the defense had rested its case. Appellant argues

that the State should have disclosed the photograph during discovery pursuant to Crim.R. 16.

*Criminal Rule 16*

**{¶53}** Discovery in a criminal proceeding is governed by Crim.R. 16(B)(1) which provides in pertinent part:

> "(c) Documents and tangible objects. Upon motion of the defendant the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, available to or within the possession, custody or control of the state, and which are material to the preparation of his defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant."

**{¶54}** The State is required to provide in discovery materials it reasonably anticipates using at trial. *See State v. Finnerty* (1989), 45 Ohio St.3d 104, 108, 543 N.E.2d 1233.

**{¶55}** In *State v. Wiles* (1991), 59 Ohio St.3d 71, 78–79, 571 N.E.2d 97, the Supreme Court stated a trial court has discretion under Crim.R. 16(E)(3) to determine the appropriate response for failure of a party to disclose material subject to a valid discovery request. *See also State v. Parson* (1983), 6 Ohio St.3d 442, 6 OBR 485, 453 N.E.2d 689. To determine whether a trial court has abused its discretion in dealing with Crim.R. 16 violations, we look to whether (1) the violation was willful, (2) foreknowledge would have benefited the defendant, and (3) the defendant suffered prejudice as a result of the state's

failure to disclose the information. *Wiles, supra. See, State v. Jones,* 2009-Ohio-2381, ¶ 14, 183 Ohio App.3d 189, 193–94, 916 N.E.2d 828, 831 abrogated by *State v. Darmond,* 2013-Ohio-966, ¶ 14, 135 Ohio St.3d 343, 986 N.E.2d 971.

**{¶56}** Upon review of the record, we find no abuse of discretion. The state asserted that it had no knowledge of the photograph until the evening before trial and did not plan on using it because it did not believe it had any relevance until Appellant testified that he and A.G. left the bar around 11:00 p.m. in contradiction to A.G.'s testimony that they left "very late." Further, counsel for Appellant had the opportunity to examine the photograph prior to its introduction and to cross-examine A.G. with regard to the photograph.

**{¶57}** Additionally, this Court finds very little probative value in the photograph with regard to the charges in this case.

*Rebuttal Evidence*

**{¶58}** The admission or exclusion of evidence lies in a trial court's sound discretion "so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake County,* 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991); *State v. Sage,* 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

**{¶59}** In general, "[a]ll relevant evidence is admissible" and "[e]vidence which is not relevant is not admissible." Evid.R. 402. "Relevant evidence" "means evidence having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence."

**{¶60}**   With regard to allowing rebuttal evidence, this Court recognizes:

"Rebutting evidence is that given to explain, refute, or disprove new facts introduced into evidence by the adverse party; it becomes relevant only to challenge the evidence offered by the opponent, and its scope is limited by such evidence." *State v. McNeill*, 83 Ohio St.3d 438, 446 (1998). "A party has an unconditional right to present rebuttal testimony on matters which are first addressed in an opponent's case-in-chief and [is not testimony that should have been presented] in the rebutting party's case-in-chief." *Phung v. Waste Mgmt. Inc.*, 71 Ohio St.3d 408, 410 (1994). The trial court has discretion to determine which proper rebuttal evidence may be admitted. *State v. Carrasquillo*, 9th Dist. Lorain No. 09CA009639, 2010-Ohio-5063, ¶ 16.

**{¶61}**   *Estate of Hall v. Akron Gen. Med. Ctr.*, 9th Dist. Summit No. 24066, 2011-Ohio-60, ¶ 4.

**{¶62}**   To reverse on the basis of an abuse of discretion, this Court must conclude that the trial court was unreasonable, arbitrary, or unconscionable in its ruling. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶63}**   Here, as stated above, the rebuttal testimony and evidence was offered solely to rebut Appellant's testimony about the time the couple left the bar and went home. We find no evidence that Appellant's right to a fair trial was affected by the introduction of

the photograph. We therefore find that the evidence was relevant for the limited purpose of rebuttal and that the trial court did not abuse its discretion in allowing such evidence.

**{¶64}** Appellant's second assignment of error is overruled.

### III.

**{¶65}** In his third assignment of error, Appellant argues the trial court erred in denying his motion for a mistrial. We disagree.

**{¶66}** The grant or denial of a mistrial rests within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 182. Moreover, mistrials need be declared only when the ends of justice so require and a fair trial is no longer possible. *State v. Franklin* (1991), 62 Ohio St.3d 118. "An appellate court will not disturb the exercise of that discretion absent a showing that the accused has suffered material prejudice." *Sage, supra* at 182.

**{¶67}** Here, the basis for Appellant's motion was a violation of Crim.R. 16 for the State's failure to provide the photograph during discovery.

**{¶68}** For the reasons stated in our review and disposition of Appellant's second assignment of error, we find no abuse of discretion in the trial court's denial of Appellant's motion for a mistrial.

**{¶69}** Appellant's third assignment of error is overruled.

### IV.

**{¶70}** In his fourth Assignment of Error, Appellant argues that the Reagan Tokes Law, specifically the presumptive release feature of R.C. §2967.271, is unconstitutional. We disagree.

{¶71} We first note that pursuant to *State v. Maddox*, Ohio St.3d, 2022-Ohio-764, N.E.3d, constitutional challenges to the Reagan Tokes Act are ripe for review on direct appeal.

{¶72} In *State v. Householder*, 5th Dist. Muskingum No. CT2021-0026, 2022-Ohio-1542, this Court set forth its position on the arguments raised in Appellant's fourth Assignment of Error:

> For the reasons stated in the dissenting opinion of The Honorable W. Scott Gwin in *State v. Wolfe*, 5th Dist. Licking No. 2020CA00021, 2020-Ohio-5501, we find the Reagan Tokes Law does not violate Appellant's constitutional rights to trial by jury and due process of law, and does not violate the constitutional requirement of separation of powers. We hereby adopt the dissenting opinion in *Wolfe* as the opinion of this Court. In so holding, we also note the sentencing law has been found constitutional by the Second, Third, Sixth, and Twelfth Districts, and also by the Eighth District sitting en banc. *See, e.g., State v. Ferguson*, 2nd Dist. Montgomery No. 28644, 2020-Ohio-4153; *State v. Hacker*, 3rd Dist. Logan No. 8-20-01, 2020-Ohio-5048; *State v. Maddox*, 6th Dist. Lucas No. L-19-1253, 2022-Ohio-1350; *State v. Guyton*, 12th Dist. Butler No. CA2019-12-203, 2020-Ohio-3837; *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470. Further, we reject Appellant's claim the Reagan Tokes Act violates equal protection for the reasons stated in *State v. Hodgkin*, 12th Dist. Warren No. CA2020-08-048, 2021-Ohio-1353.

**{¶73}**   Based on the foregoing authority, Appellant's fourth Assignment of Error is overruled.

**{¶74}**   For the forgoing reasons, the judgment of the Court of Common Pleas, Licking County Ohio, is affirmed.

By: Wise, J.

Hoffman, P. J., and

Baldwin, J., concur.

JWW/kw 1201